Alan E. Marder
Edward J. LoBello
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
Garden City, New York 11530-9194
Tel.: (516) 592-5708
Fax: (516) 741-6706
Email: elobello@msek.com
        amarder@msek.com

*Counsel for Post-Confirmation Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

JJT ENERGY LLC,                                    Chapter 11
                                                   Case No. 15 - 70535 (AST)

                              Debtor.
-----------------------------------------------------------x
POST-CONFIRMATION COMMITTEE
OF UNSECURED CREDITORS OF
JJT ENERGY LLC,

                              Plaintiff,           Adv. Proc. No.

    - against –                                    **COMPLAINT**

ROBERT CATELL, IRWIN G. COOPER,
UNITED ENERGY SUPPLIERS, LLC, COOPER
COMMUNICATIONS GROUP, LLC and
JOHN DOES 1 – 10,

                              Defendants.
-----------------------------------------------------------x

Plaintiff, the Post-Confirmation Committee of Unsecured Creditors ("**Committee**") of

JJT Energy LLC (the "**Debtor**"), by its attorneys, Meyer, Suozzi, English & Klein, P.C., for its

complaint against Robert Catell ("**Catell**"), Irwin G. Cooper ("**Cooper**"), United Energy

Suppliers, LLC ("**UES**"), Cooper Communications Group, LLC ("**CCG**"), and John Does 1-10

(collectively, "**Defendants**"), alleges as follows:

## JURISDICTION, VENUE AND STANDING

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

2.    Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a).

3.    This action is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B), (E), (F) and (H).

4.    The Committee has standing to file this Complaint and prosecute the within causes of action pursuant to this Court's Order (I) Approving Disclosure Statement for Plan of Liquidation for JJT Energy LLC Under Chapter 11 of the Bankruptcy Code, (II) Confirming Plan of Liquidation for JJT Energy LLC Under Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief dated December 9, 2016 (the "**Confirmation Order**").

## NATURE OF ACTION

5.    The Committee, on behalf of the Debtor and its estate, brings this action against the Defendants under sections 502, 541, 542, 544, 547, 548, and 550 of title 11, United States Code (the "**Bankruptcy Code**"), New York Debtor and Creditor Law sections 273, 274, 275, 276, and 276-A, and under New York State law to avoid preferential and fraudulent transfers, for breach of fiduciary duty, to recharacterize alleged debt as equity, disallowance of claims and for equitable subordination.

6.    Virtually every action taken by Catell and Cooper, as principals of the Debtor, was taken to promote their own self-interests at the expense of the Debtor and its creditors. Whether it was selling natural gas to Cooper at below cost rates or diverting hundreds of thousands of dollars to themselves that were expressly earmarked for creditors by contract, Catell

and Cooper elevated paying back their equity investments in the Debtor (plus 12% interest), over repaying creditors or sufficiently capitalizing the Debtor.

7.    At the time that Catell and Cooper, through UES, purchased the Debtor, the Debtor was already insolvent and, through Catell and Cooper's mismanagement and greed, Catell and Cooper caused the Debtor to plunge deeper and deeper into insolvency, leaving creditors with over $3 million of claims against the Debtor "holding the bag".

8.    Despite the Debtor's insolvency at the time that Catell and Cooper acquired control of the Debtor, Cooper and Catell caused the Debtor to incur approximately $1 million of debt to fund Cooper and Catell's purchase of the Debtor's members' equity interests.

9.    Cooper and Catell also kept adding customers to the Debtor even though they knew or should have known that their addition of customers merely added to the Debtor's losses and insolvency.

10.    While Cooper and Catell have tried to characterize certain advances they made to the Debtor as loans, UES, Catell and Cooper's advances to the Debtor were, in fact, capital contributions and equity investments.

11.    Moreover, even if Catell and Cooper and their affiliates actually made loans, as insiders of an insolvent entity, all of the transfers received by them are recoverable by the Committee as preferences and/or fraudulent conveyances because the Debtor was insolvent at the time of all such transfers and Catell and Cooper made those transfers with the intent to hinder, delay and defraud creditors.

12.    The most outrageous part of Catell and Cooper's scheme to drain the Debtor of all of its assets for themselves is that Cooper and Catell actively mislead creditors so that Catell and Cooper could divert the assets of the Debtor to themselves without interference by creditors.

These acts, as well as other actions of Catell and Cooper detailed below, constitute a breach of their fiduciary duties to the Debtor and a basis upon which to equitably subordinate their claims against the Debtor's estate.

13.    Furthermore, as set forth below, to the extent that Catell, Cooper and their affiliates have any claims in this case, those claims should not only be equitably subordinated but should also be (a) recharacterized as equity, and/or (b) disallowed altogether under § 502(d) of the Bankruptcy Code.

14.    In short, as admitted by Catell, Catell and Cooper's only concern was to get their investments in the Debtor paid back with 12% interest and not with the proper capitalization of the Debtor or satisfaction of debts incurred by the Debtor.

## THE PARTIES

15.    Upon information and belief, Catell is an adult individual who resides in Nassau County, State of New York. At all times relevant herein, Catell was the fifty percent owner and member of UES, the chairman of the board of directors of the Debtor, Senior Advisor to MyGrid, LLC and a member of the Board of Advisors of CCI Energy Solutions, LLC ("**CCIES**"). Catell was employed by National Grid and its predecessors, a creditor of the Debtor, for over fifty years ultimately achieving the position of Vice-Chairman and an $81.4 million severance payment upon his exit from National Grid.

16.    Although Catell was the Chairman of the Board of Directors of the Debtor, he admits that the Debtor never held a board meeting while Cooper and Catell controlled the Debtor.

4

17.    Upon information and belief, Cooper is an adult individual who resides in the County of Nassau, State of New York.  At all relevant times herein, Cooper was the fifty percent owner and managing member of UES and CEO and president of the Debtor.

18.    Upon information and belief, UES is a New York limited liability company with a principal place of business in Garden City, New York.  UES is the sole owner and managing member of the Debtor.

19.    Upon information and belief, Cooper Communications Group, LLC ("**CCG**"), is a New York limited liability company with a principal place of business in Garden City, New York and is wholly owned and controlled by Cooper.

20.    Catell, Cooper, UES and CCG are collectively referred to herein as the ("**Insiders**").

21.    Upon information and belief, the Debtor is a New York limited liability company with a principal place of business in Rockville Centre, New York.

22.    John Does 1 – 10 represent unknown entities who may be immediate or mediate transferees of Cooper, Catell, UES and/or CCG.

## FACTS

### A.    Background

23.    The Debtor was an energy services company ("**ESCO**"), that supplied natural gas to customers in New York.

24.    Through a series of transactions that closed on November 30, 2012 (the "**Closing**") (described in ¶¶ 35 – 55 below) (the "**Agreement**"), Catell and Cooper acquired, through UES, 73.87% of the membership interests of the Debtor.

25.    Effective in December 2013, Catell and Cooper, through UES, acquired the remaining 26.13% of the membership interests of the Debtor.

26.     On or about February 12, 2015 (the "**Petition Date**"), Mieco, Inc. ("**Mieco**"), Richard Mauch, Jr. and Richard Mauch, Sr. filed an involuntary petition against Debtor under chapter 7 of the Bankruptcy Code.  Subsequently, additional creditors (Walter Josiah and Robert Croke), joined the involuntary petition.

27.     On April 10, 2015, the Court entered an order converting the Debtor's case from a case under chapter 7 of the Bankruptcy Code to a case under chapter 11 of the Bankruptcy Code.

28.     The Debtor was authorized to continue to operate its business and property as debtor in possession under Bankruptcy Code §§1107 and 1108.

29.     On May 28, 2015, the United States Trustee's Office appointed Robert Croke, Richard Mauch, Jr. and Mieco as members of the Official Committee of Unsecured Creditors of JJT Energy LLC.

30.     Pursuant to the Confirmation Order, Post-Confirmation Committee was authorized to prosecute the estate causes of action asserted herein.

**B.     Defendants Knew That The Debtor Was Insolvent**
**When They Purchased Equity Interests In The Debtor**

31.     The Insiders knew, at the time that they entered into the Agreement, that the Debtor was insolvent.  Despite Debtor's insolvency, Cooper and Catell added approximately $1 million of debt to the Debtor in connection with their purchase of the membership interests in the Debtor.

32.     Cooper, and Cooper and Catell's attorney admitted, in writing, that he knew that the Debtor was insolvent prior to the Closing.  Cooper and Catell's attorney also admitted that the Agreement was structured to take into account that the Debtor was insolvent and, upon information and belief, to hide the fact that Cooper and Catell's purchase of the membership interests (in the Debtor) was a fraudulent conveyance.

33.     Cooper was well aware of the undercapitalization of the Debtor prior to the Closing because he made hundreds of thousands of dollars of emergency "loans" to the Debtor in the approximate one-year period prior to November 30, 2012 to, in his own words, "keep the doors open" and deal with imminent cash shortages to pay salaries, gas suppliers, etc.

34.     The insolvency of the Debtor was compounded by the fact that Catell and Cooper did not know anything about operating an ESCO (*i.e.*, Cooper referred to them as "neophytes").

35.     Simply stated, Catell and Cooper's venture into the ESCO business was doomed to fail from the beginning and, once they realized that, their focus was on repaying themselves for their equity investments in the Debtor (plus 12% interest), and not on protecting the Debtor or its creditors.

## C.     UES's Purchase of the Debtors' Membership Interests

36.     On or about November 30, 2012, UES, on the one hand, and Thomas Alexanderson, Richard Mauch, Jr., Douglas Mauch, Bernie O'Connell, Salvatore Palazzo, Joseph Tarulli, Robert Croke and Richard Mauch, Sr. (collectively, the "**Sellers**"), entered into the Agreement.

37.     Pursuant to the Agreement, the Sellers transferred their 55.13% membership interests in the Debtor to UES for $347,500 cash ($247,500 at closing and $100,000 post-closing).  In addition, Catell and Cooper caused the Debtor to issue $850,000 of promissory notes to the Sellers to fund the balance of Catell and Cooper's purchase of the Seller's interests in the Debtor (the "**Seller Notes**").

38.     Although the Agreement characterized the Seller Notes as being issued to replace existing promissory notes of the Debtor to Sellers, there were, upon information and belief, no prior notes and the Seller Notes were, in fact, payments for equity of an insolvent company, as

there are no references to the prior loans by Sellers in the Debtor's books and records and not one Seller could locate a copy of any alleged prior note.

39.    Upon information and belief, Cooper and Catell created the artifice of pre-existing notes so that they could claim that the Debtor's payments to the Sellers pursuant to the Seller Notes were not payments for Catell and Cooper's purchase of the Seller's equity interests in the Debtor.

40.    The Debtor received no consideration for issuing the Seller Notes and the benefit derived from issuing the Seller Notes (*i.e.*, the acquisition of the Sellers' membership interests by UES), inured solely to the benefit of UES, Catell and Cooper at the expense of the Debtor's creditors.

41.    Both prior to and simultaneously with the closing on the Agreement, the Debtor issued promissory notes to Cooper and UES (the "**Insider Notes**"), for alleged loans to the Debtor on the following dates and amounts:

| Payee | Date | Amount |
|-------|------|--------|
| Cooper | 9/14/12 | $108,000 |
| Cooper | 10/4/12 | $112,000 |
| UES | 11/6/12 | $242,000 |
| UES | 11/30/12 | $338,725 |
| UES | 11/30/12 | $58,421 |

42.    Each of the Insider Notes carried an above-market interest rate equal to 12% per annum.

43.    The Insider Notes to Cooper and UES dated prior to November 30, 2012 related to alleged loans made by Cooper and UES to the Debtor prior to the Closing and were made, in Cooper's words, to "keep the doors open".

44.     The Insider Notes issued on November 30, 2012 were, for the most part, issued to memorialize the balance of the purchase price for Sellers' equity interests in the Debtor and did not represent loans to the Debtor at all.

45.     The Debtor executed security agreements ("**Insider Security Agreements**") with respect to the Insider Notes.

46.     Each of the Insider Security Agreements defined "Collateral" as follows:

> All accounts, accounts receivable, contract rights, chattel paper, instruments, letter of credit rights, payment intangibles, general intangible rights to payment of money, and amounts due (collectively, the "Accounts") from each Utility Entity, together with all deposit accounts. As used herein, the term "Utility Entity" shall mean, jointly and severally, Niagara Mohawk Power Company d/b/a National Grid, Con Edison of New York, Inc., The Brooklyn Union Gas Company d/b/a National Grid NY and Keyspan Gas East Corporation d/b/a National Grid, and any and all subsidiaries and/or affiliates of the foregoing.

47.     In addition, the Insider Security Agreements provide that it was anticipated that UES "will be making additional loans to the Debtor and that such loans will be evidenced by Promissory Notes of the Debtor to the Secured Party." (Emphasis supplied).

48.     No note or security agreement was ever issued by the Debtor in favor of Catell or CCG. The Debtor did not issue any notes or security agreements in favor of Cooper or UES other than the Insider Notes and Insider Security Agreements referred to in paragraph 40 above.

49.     Simultaneously with the execution of the Agreement, UES, on the one hand, and James M. DeJong, Jonathan Crist and Tracy Lloyd (collectively, the "**Former Members**"), on the other, entered into an agreement pursuant to which the Debtor agreed to pay the Former Members $125,000 ($60,000 cash at the Closing and the balance by $65,000 of promissory notes issued in favor of the Former Members), in exchange for the Former Members releasing their claims against the Debtor, including their claim to equity interests in the Debtor.

50.    Once again, Cooper and Catell used the Debtor's assets to fund a transaction with the Former Members which benefitted Cooper and Catell at the expense of the Debtor.

51.    At the Closing of the Agreement, UES disbursed $644,646.13 as follows:

A.    $350,656.75 to the Sellers as partial payment for the purchase of their equity interests in the Debtor;

B.    $60,000 as partial payment to the Former Members to release their claim to have an equity interest in the Debtors.

C.    $233,989.38 to alleged outside lenders.

52.    Thus, despite the Debtor having issued $397,146 of Insider Notes to UES at closing, at best, only $233,989.38 of those disbursements inured to the Debtor's benefit, and even that amount is suspect because (a) there is no proof that the outside lenders had promissory notes and (b) $120,000 of these payments were made with respect to a "loan" recorded as being made by Joseph Graham, the former principal of the Debtor.

53.    In addition, pursuant to the Insider Security Agreements, the Debtor agreed to transfer its right to receive $467,000 owed by Herald National Bank to the Debtor to Cooper and, upon information and belief, Herald National Bank paid Cooper $467,000 of the Debtors' funds to repay his and UES's pre-acquisition loans.

54.    The payment by Herald National Bank to Cooper exceeded the total amount of Cooper's and UES's Insider Notes issued prior to November 30, 2012.

55.    As set forth in the Debtor's Second Operating Agreement, as a result of the November 30, 3012 transactions, Catell and Cooper, through UES, owned 73.87% of the Debtor and the former principals of the Debtor (Joseph Graham, Thomas Graham and Thomas Grech), each owned 8.71% of the Debtor.

56.    As set forth in paragraphs 79 – 82, Cooper and Catell subsequently induced the Grahams and Grech to surrender their interests in the Debtor by releasing a $608,000 claim of the Debtor against the Grahams.

**D.    The Insider Transfers**

57.    Cooper and Catell caused the Debtor to transfer the following sums, on the following dates, to Cooper:

| Type | Date | Check or Wire | Amount |
|---|---|---|---|
| 2 Yrs | 12/23/13 | Wire | $11,500.00 |
| 1 Yrs | 3/21/14 | 2834 | $900.00 |
| 1 Yrs | 5/2/14 | 2841 | $120,000.00 |
| 1 Yrs | 6/17/14 | 2848 | $25,000.00 |
| 1 Yrs | 7/25/14 | 2854 | $25,000.00 |
| 1 Yrs | 8/9/14 | 2861 | $17,500.00 |
| 1 Yrs | 10/3/14 | 2865 | $24,000.00 |
| 1 Yrs | 10/22/14 | 2859 | $23,500.00 |
|  |  |  | $247,400.00 |

58.    Cooper and Catell caused the Debtor to transfer the following sums, on the following dates, to Catell:

| Type | Date | Check or Wire | Amount |
|---|---|---|---|
| 2 Yrs | 12/23/13 | Wire | $11,500.00 |
| 1 Yrs | 3/21/14 | 2833 | $900.00 |
| 1 Yrs | 5/2/14 | 2842 | $120,000.00 |
| 1 Yrs | 6/17/14 | 2849 | $25,000.00 |
| 1 Yrs | 7/25/14 | 2853 | $25,000.00 |
| 1 Yrs | 8/9/14 | 2860 | $17,500.00 |
| 1 Yrs | 10/3/14 | 2863 | $24,000.00 |
| 1 Yrs | 10/22/14 | 2838 | $23,500.00 |
|  |  |  | $247,400.00 |

59.    Cooper and Catell caused the Debtor to transfer the following sums, on the following dates, to CCG:

| Type | Date | Check or Wire | Amount |
|------|------|---------------|--------|
| 1 Yrs | 3/5/13 | Wire | $293,033.33 |
| 1 Yrs | 2/25/14 | 2824 | $15,545.93 |
| 1 Yrs | 4/29/14 | 2839 | $3,406.78 |
| 1 Yrs | 6/3/14 | 2844 | $1,718.39 |
| 1 Yrs | 10/3/14 | 2864 | $1,250.00 |
| | | | $314,954.43 |

60.    Cooper and Catell caused the Debtor to transfer the following sums, on the following dates, to UES:

| Type | Date | Check or Wire | Amount |
|------|------|---------------|--------|
| 2 Yrs | 3/1/13 | 2138 | $889.74 |
| 2 Yrs | 3/5/13 | Wire | $311,873.10 |
| 2 Yrs | 4/1/13 | 2227 | $1,946.75 |
| 2 Yrs | 4/30/13 | 2272 | $312.50 |
| 2 Yrs | 5/1/13 | 2271 | $1,946.75 |
| 2 Yrs | 6/3/13 | 2360 | $2,259.25 |
| 2 Yrs | 7/1/13 | 2408 | $2,259.25 |
| 2 Yrs | 8/1/13 | 2498 | $2,259.25 |
| 2 Yrs | 8/28/13 | 2545 | $2,259.25 |
| 2 Yrs | 9/24/13 | 2580 | $2,259.25 |
| 2 Yrs | 10/31/13 | 2702 | $2,259.25 |
| 2 Yrs | 11/25/13 | Wire | $8,500.00 |
| 2 Yrs | 12/2/13 | 3736 | $2,259.25 |
| 2 Yrs | 12/2/13 | Wire | $50,000.00 |
| 2 Yrs | 12/11/13 | Wire | $1,000.00 |
| 2 Yrs | 12/17/13 | Wire | $32,000.00 |
| 2 Yrs | 12/23/13 | 2759 | $2,259.25 |
| 2 Yrs | 12/23/13 | Wire | $19,000.00 |
| | Total: | | $445,542.84 |

61.    The transfers referred to in paragraphs 56 – 59 are collectively referred to herein as the ("**Insider Transfers**").

62.    Each of Cooper, Catell, CCG and UES is and, at all times relevant herein, was an "insider" of the Debtor as that term is defined in 11 U.S.C. §101(31).

12

E.    **Cooper and Catell's Acquisition of the Seller Notes**

63.    Receiving the return of their equity investment plus above market interest was not sufficient to satisfy Catell and Cooper's greed and desire to drain every dollar from the Debtor for themselves.

64.    In January 2013, Catell and Cooper, through UES, embarked on a campaign to purchase the Seller Notes so that they would be the beneficiaries of the Seller Notes and the 12-18% interest on the Seller Notes which the Debtor issued to fund Cooper and Catell's acquisition of the Seller's equity interests in the Debtor.

65.    In all, upon information and belief, UES purchased $613,000 of the high yield Sellers' Notes so that Catell and Cooper could earn 12-18% interest on their own equity purchases.

66.    Thus, Catell and Cooper benefitted twice – first by causing the Debtor to issue the Seller Notes to fund their acquisition of the Sellers' equity in the Debtor and, then, by collecting 12-18% interest, themselves, on the Seller Notes.

67.    The Debtor did not receive "fair consideration" or "reasonably equivalent value" for the Insider Transfers in that each of the Insider Transfers was either:  (a) repayment of alleged equity investments by UES, Catell and Cooper while the Debtor was insolvent; (b) equity distributions while the Debtor was insolvent; (c) alleged but non-existent loans; (d) alleged loans that were not loans at all but used to finance UES, Cooper and Catell's purchase of the Seller's and Former Members' membership interests in the Debtor; (e) excessive above-market interest payments to UES, Catell, CCG and Cooper; (f) in excess of any loan or equity investment made by Cooper and Catell; and (g) with respect to Catell and CCG, there is no evidence that either of them ever made a loan or other transfer to the Debtor.

**F.**    **The Debtor Was Insolvent At the Time Of Each Insider Transfer**

68.    The Debtor was insolvent on each of the dates referred to in paragraphs 56 – 59 above.

69.    As of December 31, 2011, the Debtor's balance sheet indicated that the Debtor had assets of $1,020,893 and liabilities of $1,492,734, leaving a deficit of $471,841.00.

70.    The Debtor's insolvency increased throughout 2011 as a result of the Debtor's continued losses and, on November 30, 2012 (the date of the Closing on the Agreement), the extent to which the Debtor was insolvent exploded as a result of the significant debt placed on the Debtor to fund Catell and Cooper's purchase of the Debtor through UES.

71.    As a result of the Debtor's 2011 losses and the debt placed on the Debtor to fund Catell and Cooper's purchase of the Sellers' membership interests, the Debtor's November 30, 2012 balance sheet reported that the Debtor had $731,704 of assets and $3,270,451 of liabilities – a $1,777,717.00 increase in liabilities over the balance sheet issued by the Debtor for the period ending eleven months earlier.  As of November 30, 2012, the deficit increased to $2,538,747.00.

72.    By the end of 2012, the Debtor's balance sheet reported that the Debtor had assets of $1,096,439 and liabilities of $3,759,127, a deficit of $2,662.668.

73.    As a result of continued losses, the Debtor's balance sheet reported that, by the end of 2013, the Debtor had assets of $463,498 and liabilities of $4,610,944, a deficit of $4,147,446.

74.    According to the Debtor's balance sheet, as of May 31, 2015, the Debtor had assets of $341,903 and liabilities of $3,702,012, a deficit of $3,360,109.

75.    As a result of continued losses, the Debtor's balance sheet reported that, by the end of 2015, the Debtor had assets of $799 and liabilities of $3,675,284, a deficit of $3,674,485.

76.    Because of Catell and Cooper's poor management, the Debtor lost over $1 million in the first nine months of 2013.

77.    In addition to balance sheet insolvency, the Debtor was unable to pay its debts when they became due.  For instance, the Debtor did not pay Mieco, its gas supplier, after October 2013; fell behind (and never caught up) on its debt to National Grid beginning in February 2013; and certain creditors, such as the N.Y. Islanders, were not paid during Cooper and Catell's entire reign as principals of the Debtor even though the Debtor's debt to the N.Y. Islanders pre-existed Cooper and Catell taking control of the Debtor.

78.    Catell and Cooper also realized that making the Debtor solvent was impossible because, while Catell's efforts to increase the number of the Debtor's customers were successful, the addition of customers only added to the Debtor's losses.  As Catell acknowledged on November 27, 2013, and in his 2004 examination, the more Catell improved revenues by adding customers, the worse Debtor's numbers got.

79.    Indeed, it became clear (or should have been clear) early on in their tenure as Chairman of the Board, CEO and president of the Debtor that Cooper, the Debtor's CFO and Catell's lack of expertise in running an ESCO (*i.e.*, Cooper admitted that Cooper and Catell as "neophytes") and the Debtor's lack of financial resources, the Debtor was doomed to fail and Catell and Cooper's focus shifted to draining the Debtor's assets for themselves without regard to the Debtor and its creditors.

## G.    The Buy-Out Of The Grahams Was Designed To Benefit Catell And Cooper At The Expense Of The Debtor's Creditors

80.    On or about September 9, 2013, Joseph Graham admitted that he owed the Debtor $608,000 for, among other things, the non-payment of sales tax.

81.    However, rather than require repayment of the $608,000 debt from the Grahams to the Debtor, Catell and Cooper caused the Debtor to release all of its claims against the Grahams and Thomas Grech in exchange for the Grahams and Grech surrendering their interests (approximately 26%) in the Debtor, thereby, making Cooper and Catell, through UES, the sole owners of the Debtor.

82.    The only parties benefitting from the release of the Debtor's claims against the Grahams were the Grahams who received a release of $608,000 of claims against them and UES, Catell and Cooper who increased their percentage ownership in the Debtor by approximately 26% giving them 100% ownership in the Debtor.

83.    In contrast, the Debtor (who owned the $608,000 claim against the Grahams), received no consideration whatsoever in exchange for the release of the claims against the Grahams and Grech.

## H.    The Debtors Agreement With MyGrid And Its Use Of That Agreement To Hinder, Delay And Defraud Creditors

84.    With losses mounting and debts rising, and with no ability to function as ESCO managers, Catell and Cooper decided to exit the Debtor's business in or before November 2013.

85.    However, rather than engage in a marketing process to ensure the recovery of fair value for the Debtor and its creditors, Catell and Cooper contacted a single potential buyer, a long-time friend and colleague of Catell's named Richard Rapp who, at the time, was the president of CCIES. Upon information and belief, CCIES was a joint venture between Castleton Commodities, Inc. and Chesapeake Fuel Co.

86.    On or before November 24, 2013, Catell contacted Rapp about transferring the Debtor's customers to MyGrid, LLC, a wholly owned subsidiary of CCIES.

87.   Catell and Cooper were so anxious to transfer the Debtor's customers – which Catell and Cooper believed were worth $1.5 million -- to MyGrid that they caused the Debtor to transfer its customers to MyGrid on or about December 10, 2013 <u>before</u> any agreement had been executed by the Debtor or MyGrid.

88.   It was not until December 11th 2013 and February 19, 2014, respectively, that the Debtor and CCIES entered into a Letter of Intent ("**MyGrid LOI**") and formal agreement ("**MyGrid Agreement**"), respectively, to transfer the Debtor's customers to MyGrid.

89.   Catell had a clear conflict with respect to the MyGrid LOI and MyGrid Agreement because he was a long-time friend of Rapp, and Senior Advisor to MyGrid at the time that the Debtor entered into the MyGrid Agreement.  Adding to this conflict, Catell became a member of CCIES's Advisory Board shortly after the execution of the MyGrid LOI and Catell and an investor group attempted to obtain a controlling interest in CCIES without participation of the Debtor.

90.   A key provision of the MyGrid LOI and MyGrid Agreement was the requirement that the Debtor promptly pay debts to specified third-parties from the proceeds the Debtor received pursuant to the MyGrid Agreement including:  (a) the local distribution companies (*i.e.*, National Grid and Con Edison), (b) the gas transportation pipeline companies, and (c) Mieco (collectively, the "**Debt**"), until the Debt was paid in full ("**Payment Provision**")."

91.   In the period between December 2013 and January 2014, Catell, Cooper and Greg Canova (the Debtor's CFO) repeatedly advised Mieco, the Sellers and other creditors to forbear from pursuing remedies against the Debtor because they were protected by the Payment Provision.

92.     Mieco's attorney sent the Debtor a letter dated January 8, 2014 advising Cooper and Catell that Mieco was considering filing an involuntary bankruptcy proceeding against the Debtor. To delay Mieco from protecting its rights, Canova sent Mieco the MyGrid LOI to confirm what Catell, Cooper and Canova were telling Mieco -- Mieco's claim would be satisfied by the first proceeds from the MyGrid LOI and Payment Provision.

93.     However, Catell and Cooper never intended to honor the Payment Provision and diverted $474,800 of the $610,000 paid by MyGrid pursuant the MyGrid Agreement to themselves.

94.     Moreover, on December 23, 2013, Catell falsely advised Peter D'Anna of Mieco that National Grid owed the Debtor $2.4 million. This was very important to Mieco because, under the MyGrid LOI, National Grid would also be paid from the proceeds of the MyGrid Agreement. In fact, at the time that Catell made the aforesaid representation to D'Anna, the Debtor owed National Grid several hundreds of thousands of dollars.

95.     Upon learning of Catell's misrepresentation to D'Anna, Canova advised Cooper and Catell, in writing, that Catell's representation to D'Anna was false.

96.     Despite knowing that Catell's representation was false, neither Catell, Cooper nor Canova contacted Mieco to supply Mieco with accurate information regarding the Debtor's debt to National Grid but, instead, let Catell's false representation stand as a means of delaying Mieco from taking action to collect its debts.

97.     Similarly, when Doug Jeter of Mieco inquired whether any creditor had received payments under the MyGrid Agreement, Greg Canova represented that no payments had been distributed to "unsecured creditors".

98.    Canova's representation, with Catell and Cooper's approval, was designed to mislead Mieco and conceal the fact that Catell and Cooper had already diverted hundreds of thousands of dollars of the proceeds from the MyGrid Agreement to themselves in violation of the express terms of the MyGrid Agreement.

99.    On December 31, 2013 and February 5, 2014, Canova mislead Mieco by representing to Douglas Jeter and Peter D'Anna of Mieco, respectively, that the Debtor had not transferred any customer accounts to MyGrid when, in fact, the Debtor caused its customer accounts to be transferred to MyGrid on December 9th or 10th, 2013.

100.    All four the representations in paragraphs 90 – 98 above were false and/or misleading and made by UES, Cooper and Canova to cause Mieco to delay taking action to protect its rights.

101.    However, despite the plain and ambiguous terms of the Payment Provision and Catell and Cooper's representations to creditors, Cooper and Catell diverted $494,800 of the $610,000 paid by MyGrid under the MyGrid Agreement to themselves.

102.    Catell and Cooper used the MyGrid Agreement and the Payment Provision to lull creditors into a false sense of security believing that they would be paid from the first proceeds of the MyGrid Agreement so that Catell and Cooper could continue their campaign of extracting all of the value from the Debtor for themselves without interference by creditors.

103.    In June 2014, Catell and Cooper learned that CCIES wanted to exit the ESCO and energy retrofit business.

104.    Rather than share this opportunity with the Debtor and its creditors, Catell, Rapp and Cooper obtained the exclusive right to obtain a controlling interest in CCIES during the period from June 2014 to December 2014.

105.    While the first term sheets to purchase CCIES drafted at the direction of Catell, recognized that the new entity created by Catell, Rapp and Cooper for their investment in CCIES would pay the Debtor the profits from the Debtor's book of business (*e.g.*, the October 6, 2014 term sheet), the term sheet actually signed by Catell in November 2014 omitted any reference to the Debtor or the right of the Debtor to receive profits from the Debtor's book of businesses.

106.    In the six month period during which Catell, Rapp and Cooper had the exclusive right to obtain a controlling interest in CCIES, Catell and Cooper did not consider or pursue a back-up transaction to preserve the value of the Debtor's book of business which Catell and Cooper allegedly believed to be worth up to $1,500,000.

107.    Upon information and belief, the attempts by Catell, Cooper and Rapp to buy CCIES failed when they changed their proposal "at the last minute" and, in or around December 2014, CCIES cut-off negotiations with Catell, Cooper and Rapp, fired Rapp and announced their intention to turn the Debtor's customers over to National Grid.

108.    After learning this, Catell and Cooper did not attempt to preserve the Debtor's book of business for the benefit of the Debtor and its creditors.

I.    **The Insider Security Agreements Do Not
Apply To The Payments Received By The Debtor**

109.    Catell, Cooper, UES and CCG have attempted to justify the payments received from the Debtor by claiming that they are secured creditors.

110.    However, the Insider Security Agreements do not cover the transfers to Catell, Cooper, UES and CCG for, <u>inter alia</u>, the following reasons:

A.    The $494,800 of payments Catell and Cooper collected from the My Grid Agreement are not covered by the Insider Security Agreements because My Grid was not a "Utility Entity" as that term is defined in the Insider Security Agreements and,

therefore, payments by My Grid are not part of the "Collateral" as defined by the Insider Security Agreement;

B.      Alleged loans made by the Insiders after the Closing are not covered by the Insider Security Agreements because no promissory notes were issued to any of the Defendants after November 30, 2012 as required by those agreements;

C.      Payments made to UES, Catell and Cooper to reimburse them for their purchase of equity interests in the Debtor are not loans to the Debtor and are not subject to the Insider Security Agreements;

D.      Payments made to UES, Cooper and Catell for interest and principal on the Seller Notes are not covered by the Insider Security Agreements and were allegedly were unsecured loans and, further, did not represent the repayment of loans to the Debtor but represented payments for the Sellers' equity interests in the Debtor;

E.      To the extent that any of the advances made by Defendants are considered a loan, they should be recharacterized as equity based the facts and circumstances of this case;

F.      Catell and CCG are not secured parties under the Security Agreements; and

G.      All Insider Notes were, upon information and belief, paid through Herald National Bank.

J.      **Friends and Family Rate.**

111.    Cooper was one of about fifty individuals who received below cost natural gas from the Debtor, costing the Debtor thousands of dollars.

**FIRST CLAIM FOR RELIEF**
**(Preferential Transfer, Pursuant to 11 U.S.C. § 547(b), Against Cooper, Catell and UES)**
**(Pled in the Alternative to the Second Through Sixth Claims For Relief)**

112. The Committee repeats and realleges the allegations set forth in paragraphs 1-3; 14-28; 55-60 and 66-77 hereof as if they were completely set forth herein.

113. Prior to the Petition Date, the Debtor was indebted to UES, Catell, CCG and Cooper for alleged loans made by them to the Debtor.

114. As set forth in paragraphs 55-58 above, in the one year prior to the Petition Date, Cooper received $235,900.00 of transfers from the Debtor; Catell received $235,900.00 of transfers from the Debtor and; CCG received $21,921.10 of transfers from the Debtor on account of such loans (collectively, "**One Year Transfers**").

115. Catell, Cooper, and CCG are insiders of the Debtor within the meaning of Bankruptcy Code section 101(31) and applicable case law.

116. The One Year Transfers were made on account of antecedent debt of the Debtor.

117. The Debtor was insolvent on the date that each of the One Year Transfers was made.

118. The One Year Transfers enabled Catell, Cooper and CCG to receive more than they would have received if: (a) the One Year Transfers to Catell, Cooper and CCG had not been made, and (b) Catell, Cooper and CCG received payment of their claims to the extent provided by the provisions of the Bankruptcy Code.

119. Upon information and belief, Catell and/or Cooper were the immediate and/or mediate transferees of the transfers to CCG.

120. Upon information and belief, JOHN DOES 1 – 10 are mediate and/or immediate transferees of the Transfers to Catell, Cooper and/or CCG.

121.    By reason of the foregoing, the One Year Transfers constitute avoidable preferential transfers pursuant to Bankruptcy Code section 547(b).    In accordance with Bankruptcy Code section 550(a), the Committee, on behalf of the Debtor and its estate, is entitled to recover: (a) at least $235,900 plus interest from Catell; (b) at least $235,900 plus interest from Cooper; and (c) at least $21,921.10 plus interest from CCG.

### SECOND CLAIM FOR RELIEF
### (Fraudulent Transfer, Pursuant to 11 U.S.C. § 548(a)(1)(A), Against Catell, Cooper, UES and CCG)
### (Pled in the Alternative to the First Claim)

122.    The Committee repeats and realleges the allegations set forth in paragraphs 1-109 hereof as if they were completely set forth herein.

123.    In the two years prior to the Petition Date, the Debtor transferred money and/or goods which belonged to the Debtor, to:  Cooper in the amount of at least $247,400; Catell in the amount of at least $247,400; CCG in the amount of at least $314,954.43; and UES in the amount of at least $445,542.84, with actual intent to hinder, delay, or defraud the Debtor's creditors ("**Two Year Transfers**").

124.    The following "badges of fraud" existed at the time of the Two Year Transfers:

A.    The Debtor was insolvent at the time of the Insider Transfers and the Insider Transfers further deepened the Debtor's insolvency;

B.    The Debtor received inadequate or no consideration for the Insider Transfers;

C.    The Insider Transfers were made to the insiders of the Debtor;

D.    The Insider Transfers were made in response to threats of litigation by Mieco, National Grid and others;

23

E.      The Debtor was in poor financial condition at the time of the Insider Transfers and, with respect to the Transfers made after November 2013, the Insiders had already decided to close the Debtor's business;

F.      The Insiders engaged in a series of transactions designed to benefit themselves at the expense of the Debtor and its creditors;

G.      The Insiders hid the Transfers from the Debtor's creditors;

H.      At the time of the Two Year Transfers, the Insiders knew that the Debtor would not be able to pay its debts to legitimate third-party creditors.

125.    Moreover, as set forth in paragraphs 82-100 above, Catell and Cooper actively misled creditors into not pursuing or into delaying pursuing their remedies to allow Catell and Cooper the opportunity to loot the Debtor by making the Two Year Transfers.

126.    By reason of the foregoing, the Two Year Transfers to Catell, Cooper, UES and CCG constitute actual fraudulent transfers and are avoidable under Bankruptcy Code section 548(a)(1)(A), and in accordance with Bankruptcy Code section 550(a), the Committee, on behalf of the Debtor and its estate, may recover at least:  (a) $247,400 plus interest from Catell; (b) $247,400 plus interest from Cooper; (c) $445,542.84 plus interest from UES; and (d) $314,954.43 plus interest from CCG.

127.    Upon information and belief, Catell and/or Cooper are immediate or mediate transferees of UES and CCG.

128.    Upon information and belief, JOHN DOES 1 – 10 are mediate and immediate transferees of Catell, Cooper, UES and/or CCG.

129.    By reason of the foregoing, Cooper is liable to the Committee, on behalf of the Debtor and its estate, in the amount of at least $247,400; Catell is liable in the amount of at least

$247,400; UES is liable in the amount of at least $445,542.84; and CCG is liable in the amount of at least $314,954.43.

### THIRD CLAIM FOR RELIEF
#### (Fraudulent Transfer, Pursuant to 11 U.S.C. §548(a)(1)(B), Against Catell, Cooper, UES and CCG)
#### (Pled in the Alternative to the First Claim)

130.    The Committee repeats and realleges the allegations set forth in paragraphs 1-109 hereof as if they were completely set forth herein.

131.    In the two years prior to the Petition Date, the Debtor transferred the Two Year Transfers to Catell, Cooper, UES and CCG.

132.    The Debtor received less than a reasonably equivalent value in exchange for the Two Year Transfers and (i) was insolvent on the date that each such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

133.    By reason of the foregoing, the Two Years Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(B) and, in accordance with section 550(a) of the Bankruptcy Code, the Committee, on behalf of the Debtor and its estate, may recover at least:  (a) $247,400 plus interest from Catell; (b) $247,400 plus interest from Cooper; (c) $314,954.43 plus interest from UES; and (d) $445,542.84 plus interest from CCG.

134.    Upon information and belief, Catell and/or Cooper are immediate and/or mediate transferees of UES and CCG.

135.   Upon information and belief, JOHN DOES 1 – 10 are mediate and/or immediate transferees of Catell, Cooper, UES and/or CCG.

136.   By reason of the foregoing, Cooper is liable to the Committee, on behalf of the Debtor and its estate, in the amount of at least $247,400; Catell is liable in the amount of at least $247,400; UES is liable in the amount of at least $314,954.4.; and CCG is liable in the amount of at least $445,542.84.

### FOURTH CLAIM FOR RELIEF
#### (Fraudulent Transfer, Pursuant to New York Debtor and Creditor Law §§ 273, 274, 275, Against Catell, Cooper, UES and CCG)
#### (Pled in the Alternative to the First Claim)

137.   The Committee repeats and realleges the allegations set forth in paragraphs 1-109 hereof as if they were completely set forth herein.

138.   In the two years prior to the Petition Date, the Debtor transferred $247,400 worth of money or goods, which belonged to the Debtor, to Catell, $247,400; $247,400 to Cooper; $314,954.43 to UES; and $445,542.84 to CCG.

139.   The Debtor did not receive fair consideration in exchange for such transfers or obligations and (i) was insolvent on the date that each such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

140.   The Insider Transfers cannot, as a matter of New York law, constitute fair consideration because transfers by an insolvent company to insiders are made in "bad faith" as a matter of law.

141.    By reason of the foregoing, the Two Year Transfers constitute avoidable fraudulent transfers pursuant to New York Debtor and Creditor Law sections 273, 274, and 275, as made applicable herein by Bankruptcy Code section 544(b) and, in accordance with section 550(a) of the Bankruptcy Code, the Committee, on behalf of the Debtor and its estate, may recover (a) at least $247,400 plus interest from Catell; (b) at least $247,400 plus interest from Cooper; (c) at least $314,954.43 plus interest from UES; and (d) at least $445,542.84 plus interest from CCG.

142.    Upon information and belief, Catell and Cooper are immediate and/or mediate transferees of UES and CCG.

143.    Upon information and belief, JOHN DOES 1 – 10 are mediate and/or immediate transferees of Catell, Cooper, UES and/or CCG.

144.    By reason of the foregoing, Cooper is liable to the Committee, on behalf of the Debtor and its estate, in the amount of at least $247,400; Catell is liable in the amount of at least $247,400; UES is liable in the amount of at least $314,954.43; and CCG is liable in the amount of at least $445,542.84.

### FIFTH CLAIM FOR RELIEF
### (Fraudulent Transfer, Pursuant to New York
### Debtor and Creditor Law § 276, Against Catell, Cooper, UES and CCG)
### (Pled in the Alternative to the First Claims)

145.    The Committee repeats and realleges the allegations set forth in paragraphs 1-109 hereof as if they were completely set forth herein.

146.    In the two years prior to the Petition Date, the Debtor transferred $247,400 worth of money or goods which belonged to the Debtor, to Catell; $247,000 to Cooper; $314,954.43 to UES; and $445,542.84 to CCG, with the actual intent to hinder, delay, or defraud the Debtor's creditors.

147.   As set forth in paragraphs 122-123 above, the Insider Transfers were made to hinder, delay or defraud creditors.

148.   By reason of the foregoing, the Insider Transfers constitute avoidable fraudulent transfers pursuant to New York Debtor and Creditor Law section 276, as made applicable herein by Bankruptcy Code section 544(b) and, in accordance with section 550(a) of the Bankruptcy Code, the Committee, on behalf of the Debtor and its estate, may recover:  $247,400 from Catell; $247,400 from Cooper; $314,954.43 from UES; and $445,542.84 from CCG.

149.   Upon information and belief, Catell and/or Cooper are immediate and/or mediate transferees of UES and CCG.

150.   Upon information and belief, JOHN DOES 1 – 10 are mediate and/or immediate transferees of Catell, Cooper, UES and/or CCG.

151.   By reason of the foregoing, Cooper is liable to the Committee, on behalf of the Debtor and its estate, in the amount of at least $247,400; Catell is liable in the amount of at least $247,400; UES is liable in the amount of at least $314,954.43; and CCG is liable in the amount of at least $445,542.84.

## SIXTH CLAIM FOR RELIEF
### (Reasonable Attorneys' Fees, Pursuant to New York Debtor and Creditor Law § 276-A, Against Catell, Cooper, CCG and UES
### (Pled in the Alternative to the First Claim)

152.   The Committee repeats and realleges the allegations set forth in paragraphs 1-109 hereof as if they were completely set forth herein.

153.   As set forth in paragraphs 143-149 above, Catell, Cooper, UES and CCG are liable to the Trustee for transfers made with actual intent to hinder, delay, or defraud the Debtor's creditors, pursuant to New York Debtor and Creditor Law section 276.

154.    By reason of the foregoing, Catell, Cooper, UES and CCG are liable pursuant to New York Debtor and Creditor Law section 276-A, as made applicable herein by Bankruptcy Code section 544, for reasonable attorneys' fees, together with interest, in bringing such actual fraudulent conveyance action against them.  In accordance with Bankruptcy Code section 550(a), the Committee may recover reasonable attorneys' fees, plus interest, in an amount to be determined.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Cooper and Catell)

155.    The Committee repeats and realleges the allegations set forth in paragraphs 1-109 and 120-153 hereof as if they were completely set forth herein.

156.    As officers of the Debtor and members of UES, Cooper and Catell had control over the Debtor.

157.    As officers and members of the Debtor and UES, Cooper and Catell owed a fiduciary duty to the Debtor and its creditors.

158.    Cooper and Catell breached their fiduciary duty by:

A.    placing their own interests ahead of the Debtor's and its creditors;

B.    failing to market the Debtor's book of business and transferring the Debtor's book of business to a friend of Catell's without seeking competing offers;

C.    diverting the MyGrid payments to themselves rather than paying them to creditors as required by the MyGrid Agreement and as they represented to creditors;

D.    releasing the claims of the Grahams for no consideration to the Debtor so that they could obtain 100% of the membership interests of the Debtor for themselves;

E.    paying themselves interest on their equity investments and returning their equity investments (plus 12-15% interest), while failing to pay legitimate debt;

F.      causing the Debtor to waste over $1.3 million of fraudulent conveyances to Insiders;

G.      providing Cooper and approximately fifty other friends and family with below cost natural gas for their personal use;

H.      disguising their equity investments as loans;

I.      failing to properly capitalize the Debtor;

J.      actively misleading creditors regarding the MyGrid Agreement and the treatment of payments from MyGrid; and

K.      usurping the Debtor's opportunity to purchase MyGrid or to protect the Debtor and its creditors when it learned that MyGrid and CCIES were exiting the ESCO business.

159.    As a direct and proximate result of these breaches of fiduciary duty, the Debtor has incurred at least $3,600,000.00 in damages.

160.    By reason of the foregoing, Cooper and Catell are liable to the Committee, on behalf of the Debtor and its estate, in the amount equal to at least $3,600,000 plus interest and $10,000,000 of punitive damages.

### EIGHTH CLAIM FOR RELIEF
### (To Subordinate Claims Against All Defendants)

161.    The Committee repeats and realleges the allegations set forth in paragraphs 1-109 and 120-158 as if they completely set forth herein.

162.    As set forth in the Schedules filed by the Debtor, and the proofs of claim filed by Cooper, Catell and UES, each of Cooper, Catell and UES assert secured and/or unsecured claims against the Debtor.

163.    Cooper, Catell and UES have engaged in inequitable conduct including fraud, breach of fiduciary duty, and undercapitalization of the Debtor, and have used the Debtor as an alter ego of Cooper and Catell.

164.    Cooper, Catell and UES's inequitable conduct has caused significant injuries to the Debtor and creditors of the Debtor who have unpaid and uncollectable debt from the Debtor in excess of $3 million and their conduct has conferred an unfair advantage to the Insiders.

165.    The equitable subordination of UES, CCG, Cooper and Catell's claims is consistent with the provisions of the Bankruptcy Code.

166.    By reason of the foregoing, Catell, Cooper, UES and CCG's claims in this bankruptcy case should be subordinated to the claims of all creditors of the Debtor's estate, and no payment should be made on those claims unless and until all allowed unsecured claims are paid in full.

### NINTH CLAIM FOR RELIEF
#### (To Recharacterize Alleged Debt As Equity Against All Defendants)

167.    The Committee repeats and realleges the allegations set forth in paragraphs 1-109 and 120-164 hereof as if they were completely set forth herein.

168.    Cooper, Catell, UES and CCG have claimed to have made loans to the Debtor.

169.    However, to the extent that Cooper, Catell, UES and CCG made advances to the Debtor, those advances should be treated and characterized as equity investments given that:

A.    Most of the funds advanced by the Insiders were used to fund the purchase of the Former Members' equity interests in the Debtor and were not used for the benefit of the Debtor;

B.     Other than advances made at or prior to the Closing on the Agreement, none of the advances by the Insiders was memorialized by a Note, Security Agreement or other written agreement and there was no fixed maturity date for those payments;

C.     If Cooper and Catell abided by the terms of the MyGrid Agreement, given the insolvency of the Debtor, the only way that they could have been repaid for their advances was through singular and dramatic success of the Debtor which Cooper and Catell knew was not possible;

D.     The Debtor was woefully and inadequately capitalized;

E.     Catell, Cooper and UES made the advances in the exact proportion of their direct and indirect ownership interests in the Debtor;

F.     As set forth above, there was no security for most of the advances made by the Insiders;

G.     Given the Debtor's insolvency, no reasonable creditor would loan money to the Debtor;

H.     The Insiders' claims were subordinated to loans made by Sterling National Bank;

I.     There was no sinking fund for repayment of the Insiders' advances;

J.     The overriding intent of most of the advances was to fund the Insiders' take-over of the Debtor and was not for use by the Debtors;

K.     As set forth above, under the facts of this matter, the advances made by Cooper and Catell were for the purchase of equity interests in the Debtor and the capitalization of the Debtor.

170.    For the foregoing reasons, the Insiders alleged loans to the Debtor should be characterized as equity investments or capital contributions.

## TENTH CLAIM FOR RELIEF
### (Against the Defendants)

171.    The Committee repeats and realleges the allegations set forth in paragraph 1-153 as if completely set forth herein.

172.    Property is recoverable from each of the Defendants pursuant to Bankruptcy Code sections 542 or 550 or each of the Defendants are transferees of a transfer avoidable under 544, 547, or 548.

173.    By reason of the foregoing and pursuant to Bankruptcy Code section 502(d), any claims of the Defendants against the Debtor must be disallowed until that Defendant has paid such amount of turned over such property for which each Defendant is liable under Bankruptcy code section 542 or 550.

**WHEREFORE**, the Committee respectfully requests that the Court enter judgment in favor of the Committee, on behalf of the Debtor and its estate, and against the Defendants:

(a)    On the First Claim for preferential transfer, pursuant to 11 U.S.C. § 547(b), against Cooper, Catell and CCG, avoiding the One Year Transfers and directing Cooper, Catell and CCG, to make payment to the Committee in the amount of the One Year Transfers plus interest within three days of entry of judgment; and

(b)    On the Second Claim for fraudulent transfer, pursuant to 11 U.S.C. § 548(a)(1)(A), against Cooper, Catell, UES and CCG, avoiding the Two Year Transfers and directing Cooper, Catell, UES and CCG, to make payment to the Committee in the amount of the Two Year Transfers plus interest within three days of entry of judgment; and

(c)    On the Third Claim for fraudulent transfer, pursuant to 11 U.S.C. § 548(a)(1)(B), against Cooper, Catell, UES and CCG, avoiding the Two Year Transfers and directing Cooper, Catell, UES and CCG, to make payment to the Committee in the amount of the Two Year Transfers plus interest within three days of entry of judgment; and

(d)    On the Fourth Claim for fraudulent transfer, pursuant to New York Debtor and Creditor Law § 273, 274, 275 and 11 U.S.C. § 544, against Cooper, Catell, UES and CCG,

avoiding the Two Year Transfers, and directing Cooper, Catell, UES and CCG, to make payment to the Committee in the amount of the Two Year Transfers plus interest within three days of entry of judgment; and

(e)     On the Fifth Claim for fraudulent transfer, pursuant to New York Debtor and Creditor Law § 276 and 11 U.S.C. § 544, against Cooper, Catell, UES and CCG, avoiding the Two Year Transfers to Cooper, Catell, UES and CCG, and directing Cooper, Catell, UES and CCG, to make payment to the Committee in the amount of the Two Year Transfers plus interest within three days of entry of judgment; and

(f)     On the Sixth Claim for attorneys' fees, pursuant to New York Debtor and Creditor Law § 276-A and 11 U.S.C. § 544, against, Cooper, Catell, UES and CCG, in an amount to be determined; and

(g)     On the Seventh Claim for breach of fiduciary duty, directing Cooper, Catell, UES and CCG, jointly and severally, to pay the Committee in the amount of at least $3,600,000, plus interest and punitive damages in the amount of $10,000.00;

(h)     On the Eighth Claim for equitable subordination, subordinating all of Cooper, Catell, UES and CCG's claims in this case to claims of all other creditors;

(i)     On the Ninth Claim for recharacterization of claims, recharacterizing all of Cooper, Catell, UES and CCG's alleged claims from alleged secured and unsecured claims as capital contributions and return of equity;

(j)     On the Tenth Claim against all Defendants, disallowing any claim of the Defendants against the Estate, pursuant to 11 U.S.C. § 502(d); and

(k)     Granting the Committee such other and further relief as may be just and proper.

Dated:    Garden City, New York
          December 27, 2016

                                    MEYER, SUOZZI, ENGLISH & KLEIN P.C.
                                    *Counsel for Post-Confirmation Committee of*
                                    *Unsecured Creditors*


                                    By:___/s/ Alan E. Marder_____
                                         Alan E. Marder, Esq.
                                         Edward J. LoBello, Esq.
                                    990 Stewart Avenue, Suite 300
                                    P.O. Box 9194
                                    Garden City, New York 11530-9194
                                    Phone:  (516) 741-6565
                                    Fax  :  (516) 741-6706